# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 2:16-CR-168-DBH** |
| | ) | |
| **CHRISTOPHER A. HUTCHINSON,** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

## DECISION AND ORDER ON MOTION TO SUPPRESS

This criminal negligence case arises out of a tragic event at sea off the Maine coast on Saturday, November 1, 2014. Around 1 a.m. that morning, the *No Limits* put out to sea from Tenants Harbor with its owner/captain, the defendant Christopher Hutchinson, and two crew members, Tyler Sawyer and Thomas Hammond, to pull lobster traps on 11-Mile Ridge. The weather and seas turned very bad, and the *No Limits* headed back toward port mid-morning. It capsized en route. Hutchinson, although injured, made it to a life raft. The Coast Guard rescued him around 4 p.m. and took him to Maine Medical Center where he was treated for facial contusions and lacerations and hypothermia. The two crew members were lost at sea. Around 9 p.m. that evening in the trauma room of Maine Medical Center, law enforcement drew a blood sample from Hutchinson without obtaining a warrant and under contested circumstances. Now facing federal prosecution for seaman's manslaughter, the defendant Hutchinson has moved to suppress the results of the blood test and

any later statements he made to law enforcement that were based upon the test results.[1]

I conducted an evidentiary hearing on December 18 and 20, 2017. I find the facts that follow, based on the testimony and exhibits.[2] I conclude that Coast Guard regulations do not compel a seaman to submit to a blood draw (although there are negative consequences if he refuses), that the "consent" obtained from the defendant was not voluntary, and that law enforcement did not obtain a warrant, had no basis for believing that exigent circumstances prevented them from doing so, and did not have probable cause for the blood draw. As a result, I **GRANT IN PART AND DENY IN PART** the motion to suppress.

## UNCONTESTED FACTS

Richard Yazbek, a marine investigator for the United States Coast Guard, was the duty marine investigator for Portland on Saturday November 1, 2014. He had never previously conducted a blood draw and generally asked a seaman's employer to obtain a blood draw when it was needed. But he knew that other investigators had sent mariners to Pen Bay Medical Center in Rockport to have blood drawn there.

---

[1] The defendant consented to the admission of some government exhibits (3, 6, 8, 10, 12-19, 24, 25, 32, and 33), but I admitted all over objection.

[2] I rely primarily on the testimony of those who were directly involved in the events of November 1. Those are USCG Marine Investigator Yazbek; USCG Petty Officer Lotz; Gorham Police Officer Hannon; and the defendant's mother Tina Hutchinson. I heard no testimony from Yazbek's supervisor who ordered the test and there was no evidence about what she knew at the time of ordering the test or thereafter. The government began its case with the testimony of a USCG criminal investigator who first became involved on November 12, 2014, when the drug test results were received. He took numerous statements from various people thereafter. But his initial testimony recounting the events of November 1 ultimately was unsupported in important respects (*e.g.*, whether anyone in the Coast Guard was aware before the blood draw that a drug dealer had told a crew member's father that he had sold oxycodone to the defendant, and whether there was a then available Facebook post on the same topic).

Yazbek was at home in West Bath when he received a phone call from the USCG Sector Northern New England Command Center around 6 or 6:30 p.m. about the accident, informing him that a vessel had sunk, two crew members were missing, and one was being taken to Maine Medical Center in Portland. Yazbek gathered his investigative bag and started driving to Maine Medical Center to investigate. During the drive he spoke by phone to his supervisor Lieutenant Janna Ott. The supervisor told Yazbek he needed to do drug and alcohol testing. Yazbek later told investigator Volk that at the time he believed he had 32 hours to have the drug test done. Def. Ex. 6. He also told investigator Volk that if he had been unable to get the blood drawn Saturday, he would have asked the defendant to go to Pen Bay Medical Center Sunday in Rockport. Id. Yazbek called the Command Center and asked the Command Center to arrange for Coast Guard personnel at the South Portland Coast Guard station who were qualified to do breathalyzer tests to meet him at Maine Medical Center. Yazbek also called Maine Medical Center and spoke to the emergency room doctor who told him that Maine Medical Center would not do a blood draw for a drug test. After trying various law enforcement agencies, Yazbek eventually spoke to a Maine State Police dispatcher who told him a qualified police officer would meet him at the hospital to do the blood draw. Yazbek believed the accident had occurred about 9 hours before he was called. Yazbek also learned that the father of one of the missing crew members asked to have the defendant tested for drugs and alcohol.

Yazbek arrived at the hospital around 7:30 p.m., about the same time as two USCG uniformed Petty Officers arrived from the South Portland Coast Guard station. The defendant was in a trauma room at Maine Medical Center.

When Yazbek and the two Coast Guard officers entered the defendant's hospital room, the defendant was wrapped in a "bear hugger" heat blanket. Yazbek told the defendant he was going to do an alcohol breath test, the lead petty officer described the procedure, and the defendant agreed to the test. The test result was negative for alcohol, and the two petty officers left.

Yazbek then waited for the police officer he believed the Maine State Police was sending to do the blood draw for drug testing. During that time, he was in and out of the hospital room but mostly out. At some point the defendant's mother asked him if the blood test could be delayed because the defendant had had a long day. Yazbek told her that it was required by law and regulation, that there were mandatory time limits, that it was supposed to be done as soon as possible, and that "we have to do this now." Yazbek was thinking to himself that it might be difficult to find a facility to do a drug test the next day, Sunday, since the defendant was going home to Port Clyde. Yazbek also asked hospital personnel if they could delay discharging the defendant for a short amount of time until the person who would administer the drug test arrived. Hospital personnel treated the defendant's facial lacerations with stitches between 8 and 8:30 p.m. About 15 minutes after Yazbek's request that discharge be delayed, Gorham Police Officer Dean Hannon arrived to perform the blood test with a standard kit that the Maine Department of Health & Human Services provides for police officers to use in the State of Maine. Officer Hannon drew the

defendant's blood at 9 p.m., using the I-V apparatus already in the defendant's arm without inserting a new needle. Whether the defendant actually consented to the blood draw is hotly disputed as I describe below. Yazbek believed that the defendant had to submit to the test. Hannon then and later completed certain documents that stated that the defendant had verbally consented to the blood draw, that the blood test was "mandated," and that Yazbek witnessed the blood draw. He gave the completed kit to Yazbek. Yazbek delayed an interview of the defendant until the next day because he thought the defendant was in no condition to be interviewed.

About 15 minutes after the blood draw, Maine Medical Center discharged the defendant.

In summary, soon after 6 or 6:30 p.m., Yazbek and his supervisor made the decision to have the defendant's blood drawn, knowing only that the *No Limits* had capsized and that two crew members were missing. Yazbek and Hannon conducted the draw believing that the defendant was required by law to submit to the blood draw. As appears below, the law upon which they were relying did not require the defendant to submit to the test (although it provided negative consequences for failing to do so). The government argues that I should nevertheless not suppress the test results, because the defendant voluntarily consented to the blood draw on the evening of November 1, and that even if he didn't, the blood draw was proper because the Coast Guard had probable cause to believe illegal substances were involved and had no time to seek a warrant permitting the blood draw. The government is entitled to advance those alternate arguments and I consider them carefully. The issues are more difficult than the

run-of-the-mill case, however, because the officers were not thinking in terms of probable cause, a warrant, or exigent circumstances, and the assessment is therefore a hypothetical construct. The parties also disagree vehemently over whether I can consider certain information or inferences gathered in the days, weeks, and months after November 1, 2014.

The blood test ultimately revealed that the defendant had ingested marijuana and oxycodone. Gov't Ex. 29.

## ANALYSIS

### *Fourth Amendment Background*

It has been clear since at least 1966 that compulsory blood draws are "intrusions into the human body" subject to the Fourth Amendment's prohibition on unreasonable searches and seizures. <u>Schmerber v. California</u>, 384 U.S. 757, 769-70 (1966). In <u>Schmerber</u>, the Supreme Court stated:

> The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

<u>Id</u>. Even when there is adequate evidence to support a blood draw, a warrant must be obtained first:

> Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned. . . . The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.

Id. at 770.  The Supreme Court reaffirmed these principles as recently as 2016, Birchfield v. North Dakota, 136 S. Ct. 2160 (2016), where it distinguished breath tests from blood tests:

> [T]he Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving.  The impact of breath tests on privacy is slight, and the need for [blood alcohol concentration] testing is great.  We reach a different conclusion with respect to blood tests.  Blood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test.

Id. at 2184.[3]  If there is a need for a blood test to detect substances other than alcohol, "[n]othing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances exception to the warrant requirement when there is not."  Id.  The imminent destruction of evidence can justify proceeding without a warrant if there is no time to obtain a warrant.  Schmerber, 384 U.S. at 770-71.  But in 2013, the Court rejected the argument that the natural dissipation of alcohol in human blood categorically creates exigent circumstances that justifies proceeding without a warrant in every case.  Missouri v. McNeely, 569 U.S. 141 (2013).  Instead, "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances."  Id. at 156.  I see no reason to apply a different standard when the issue is drugs rather than alcohol.

---

[3] The Court also rejected the argument that by driving a vehicle, the driver gave legally implied consent to a compelled blood draw.  Id. at 2185-86.

***"Special Needs"***

The government argues that the blood draw here was justified by the government's special need to regulate the fishing industry in the interest of safety. Gov't Opp'n 12 (ECF No. 12). It relies principally on <u>Skinner v. Railway Labor Executives' Association</u>, 489 U.S. 602 (1989). In that case, the Supreme Court upheld against a facial challenge Federal Railroad Administration regulations authorizing "mandatory" warrantless drug and alcohol testing for employees involved in certain train accidents. 489 U.S. at 606, 609, 614, 633. Although searches and seizures are not generally reasonable under the Fourth Amendment unless "accomplished pursuant to a judicial warrant issued upon probable cause," the Supreme Court held that the Federal Railroad Administration regulations fit within a "recognized exception[ ] to this rule" that is available "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" <u>Id</u>. at 619 (quoting <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873 (1987)). In <u>Skinner</u>, the Court "balance[d] the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." <u>Id</u>. Among a number of factors important to its decision, the Court emphasized that the railroad industry is highly regulated; that covered employees engage in safety-sensitive tasks; and that employee expectations of privacy are diminished given this pervasive regulation. <u>Id</u>. at 620-627.[4] Because it was resolving a facial

---

[4] Other factors important to the Court were the standardized nature of the tests; that the minimal discretion vested in those administering the tests yielded "virtually no facts for a neutral magistrate to evaluate;" that a warrant requirement would likely frustrate the purpose of the testing given the steady dissipation of drugs and alcohol from the blood stream; the government's

challenge, the Court considered only "whether the tests contemplated by the regulations can *ever* be conducted." Id. at 632 n.10 (emphasis in original).  The tests were prescribed "not to assist in the prosecution of [railroad workers], but rather 'to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.'" Id. at 620-21 (citation omitted). The Court "le[ft] for another day the question whether routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the FRA's program." Id. at 621 n.5.

The Court described the FRA testing as "mandatory," but it used that term in the sense that negative consequences to an employee resulted from refusal to undergo testing, not that an employee could be physically compelled to submit to the test.  Id. at 610-11, 615 (noting that "[e]mployees who refuse to provide required . . . samples may not perform covered service for nine months" and that an "employee who refuses to submit to the tests must be withdrawn from covered service").[5]

In this case, the government points to numerous regulations to show that commercial fishing, like railroading, is a dangerous, highly regulated industry in which workers have diminished expectations of on-the-job privacy.  Gov't Opp'n 7-12.  The defendant agrees.  The government cites two sets of Coast Guard regulations that call for drug and alcohol testing of marine workers.

---

need to rely on private industry to implement the tests; the generally limited nature of the privacy intrusions authorized by the regulations; the deterrent effect of the regulations; and the information that testing would provide to railroads about the causes of serious accidents.  Id. at 621-630.

[5] The Coast Guard regulations at issue here have a similar structure, as I discuss further in text.

The first, Subchapter F, Part 95 of Title 33 of the Code of Federal Regulations, prescribes restrictions on operating covered vessels under the influence, along with standards for drug and alcohol testing. It authorizes law enforcement officers and marine employers to "direct an individual operating a vessel to undergo a chemical test [for drugs or alcohol] when reasonable cause exists." 33 C.F.R. § 95.035(a). Reasonable cause exists when, among other things, "[t]he individual was directly involved in the occurrence of a marine casualty as defined in Chapter 61 of Title 46, United States Code." Id. § 95.035(a)(1).[6] That is the case here. When law enforcement or the marine employer directs an individual "to undergo a chemical test, the individual to be tested must be informed of that fact and directed to undergo a test as soon as practicable." Id. § 95.035(b).

The second, Part 4 of C.F.R. Title 46, elaborates the Coast Guard's regulatory authority to investigate serious marine casualties. Subpart 4.06 provides for "Mandatory Chemical Testing Following Serious Marine Incidents Involving Vessels in Commercial Service."[7] It provides that "[a]ny individual engaged or employed on board a vessel who is determined to be directly involved in [a serious marine incident] must provide a blood, breath, saliva, or urine specimen for chemical testing when directed to do so by the marine employer or a law enforcement officer." 46 C.F.R. § 4.06-5(a). Marine employers "must

---

[6] Marine casualties include "(1) death of an individual. (2) serious injury to an individual. (3) material loss of property. (4) material damage affecting the seaworthiness or efficiency of the vessel. (5) significant harm to the environment." 46 U.S.C. § 6101(a).
[7] Serious marine incidents include events involving commercial vessels resulting in "(1) One or more deaths; or . . . (4) Actual or constructive total loss of any [covered] vessel." 46 C.F.R. § 4.03-2(a)(1), (4).

ensure" that this drug and alcohol testing is conducted following a serious marine incident.  Id. § 4.06-3.

The Coast Guard regulations call for "mandatory" testing in the sense that Skinner treated the FRA testing regulations as mandatory.  Both sets of Coast Guard regulations contemplate that an individual actually may refuse the test, and impose enumerated penalties on those who do refuse.  33 C.F.R. § 95.040 (refusal is admissible in administrative proceedings); 46 C.F.R. § 4.06-5(b), (d) (employer must remove refusing individual from duties affecting safety; refusal is a violation and can result in adverse administrative proceedings and/or a civil fine); see United States v. O'Keefe, No. 03-137, 2004 WL 439897 at *1 (E.D. La. Mar. 8, 2004) (employer-directed urine test "not mandatory," but "failure to undergo the test could result in suspension of the Defendants' license to operate the tugboat").  In fact, subpart 4.06 flatly states that "No individual may be compelled to provide specimens for alcohol and drug testing required by this part." 46 C.F.R. § 4.06-5(d).

Unlike in Skinner, the defendant here is not mounting a facial challenge to the validity of these regulations (they appear constitutional in light of Skinner). Indeed, he has stipulated that commercial fishing is a highly regulated industry and a dangerous activity, that he knew he was subject to random inspections of his gear and catch by marine patrol, and that the accident qualified as a serious marine incident.  Instead, he argues that the Coast Guard regulations do not authorize a *compulsory* blood draw.  He agrees that the regulations authorize severe consequences for refusing, but says they do not permit a compelled,

nonconsensual blood draw over the objection of the person to be tested, and that the latter is what happened to him.

The defendant is correct that these regulations do not authorize compelled testing over objection.  As quoted above, one of them says so explicitly. 46 C.F.R. § 4.06-5(d).   Like the FRA regulations at issue in Skinner, the Coast Guard regulations actually contemplate refusals to submit and impose penalties for doing so.  If the regulations authorized law enforcement to direct forced chemical testing, there would be little need for them to address refusals to submit.

At oral argument, the government did not appear to claim that the blood draw was conducted pursuant to the regulations.   Rather, the government argued that the Skinner "special needs" exception applies regardless of whether the regulations permitted a compulsory blood draw, and that overall reasonableness is the applicable standard.

Skinner does not extend as far as the government would like.  Skinner was specifically concerned with "whether the tests contemplated by the regulations can ever be conducted," Skinner, 489 U.S. at 632 n.10 (emphasis original), and analyzed the balance between privacy and government interests "in the particular context."   Id. at 619.   As the government's brief notes, "[t]he circumstances under which testing could be administered were already limited by the regulations."  Gov't Opp'n 14; see Skinner, 489 U.S. at 622 ("Both the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically in the regulations that authorize them.").  The regulations at issue in Skinner provided negative consequences for refusing a test, but did not make the tests compulsory.  Skinner did not create

an across-the-board reasonableness balancing test for evaluating unauthorized administrative searches. I am aware of no authority for extending Skinner in this way, and the government has cited none. The Coast Guard regulations here properly direct negative consequences for refusing a blood draw, but do not make it compulsory. I conclude that the "special needs" exception, by itself, does not justify a compulsory blood draw.

### Consent

The government argues that even if Skinner does not support a compulsory blood draw, the defendant voluntarily consented here, and the results are therefore admissible.

I have three competing versions of what happened in the Maine Medical Center trauma room in connection with the 9 p.m. blood draw on November 1, 2014.

The defendant's mother Tina Hutchinson (the defendant was 26 years old) says that the defendant was asleep, that she asked for the blood draw to be postponed, and that she said that the defendant did not like needles, but Officer Hannon proceeded regardless, and used the I-V apparatus to obtain the defendant's blood while he was asleep without inserting an additional needle into the defendant's arm.

Coast Guard investigator Yazbek, who commissioned the draw, says that he was in the room, that the defendant was awake, that Yazbek said the test was mandatory, that Officer Hannon also told the defendant the test was mandatory, that he (Yazbek) did not hear the defendant speak, but that the defendant nodded his head in response to Officer Hannon.

Gorham Police Officer Dean Hannon, who conducted the draw at the Coast Guard's request, says that he does not remember whether Yazbek was in the room; that there were family members in the room, perhaps the mother, and that perhaps the mother objected to the draw; that the defendant was awake and that Hannon told the defendant that the test was mandatory under numerous state and federal laws; that he specifically asked the defendant whether the defendant consented to the blood draw; and that the defendant uttered the word yes aloud.

The DHHS forms Hannon completed the night in question say that Hannon obtained the defendant's verbal consent at 8:55 p.m. before the 9:00 p.m. draw. Yazbek signed a form that he had witnessed the draw. Gov't Ex.18.

Hannon's later report for the Gorham Police Department says that "[t]here was nothing unusual about the blood draw." Gov't Ex. 19.

Other people who were present in the room—the defendant's father and the defendant himself[8]—did not testify.

I do not rely on demeanor to determine the version of events that I credit on this question of consent. Although appellate courts customarily refer to the trial judge's opportunity to observe witness demeanor during testimony as a reason for deferring to the judge's factual findings, research shows that demeanor is often a defective guide to detecting falsity or truth-telling. Instead, I make my factual determinations based on what is most probable, using circumstantial evidence as it is available.

---

[8] The defendant's girlfriend was in the room during part of the evening, but the evidence does not reveal whether she was still present during the blood draw.

Here, both Yazbek and Hannon believed that the blood draw was compulsory. That is uncontested. There is no indication that Yazbek thought the defendant's consent was required. However, the forms in the DHHS kit that Hannon always uses include a consent form that Hannon completes before conducting a draw. Hannon says that he always obtains actual consent and that in the absence of actual consent, he refers the requesting law enforcement agency to the warrant process. This particular blood draw was not part of Hannon's or the Gorham Police Department's investigation; thus, Hannon had and has no particular interest in its outcome. If Hannon did take the draw while the defendant was sleeping and without his consent, he had nothing to gain by lying about it in the forms he completed. It is true that Yazbek did not hear the verbal consent that Hannon reported on the form and in his testimony. But the defendant was facing Hannon, Yazbek was farther away, and there were other people in the room who could have created ambient noise. A head nod and a quiet verbal yes are not mutually exclusive. Indeed, if Yazbek and Hannon decided to lie about what actually happened in the trauma room with respect to the blood draw's circumstances, it would be more likely that they would have agreed on a false story, rather than the messiness that often results from independent recollections of events.

I find that the defendant was awake and that he gave explicit consent to the blood draw.

### Coercion

It is undisputed that both law enforcement officers told the defendant (and his mother) that he had to submit to the blood draw. If that information was

accurate, then the defendant's consent was not required.  If that information was not accurate, then the officers gave the defendant misleading information in obtaining his consent.

The First Circuit has detailed the analysis that governs these circumstances:

> For consent to a search to be valid, . . . the government must prove by a preponderance of the evidence that the consent was uncoerced.  The presence of coercion is a question of fact based on the totality of the circumstances, including "the consenting party's knowledge of the right to refuse consent; the consenting party's possibly vulnerable subjective state; and evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place."

United States v. Vazquez, 724 F.3d 15, 18-19 (1st Cir. 2013).  Critical to my decision, the First Circuit added: "Importantly, courts must also consider 'any evidence that law enforcement officers' . . . misrepresentation prompted defendant's acquiescence to the search.'"  Id. at 19.

For the reasons I have already detailed, law enforcement erroneously told the defendant that the blood draw was compulsory.  I am satisfied that the law enforcement officers were sincere in their belief, but the First Circuit has held that subjective good faith is insufficient; they have to get the law right.[9] According to the First Circuit, consent will not validate a search if it was "secured as a result of either an unreasonable assessment of the facts or a misapprehension of the law."  Id. at 27; see also LaFave, 4 Search & Seizure § 8.2(a).  Here the defendant consented only after two law enforcement officers,

---

[9] The First Circuit does allow limited leeway in getting the facts right—there law enforcement must only be reasonable—but even on the facts, subjective good faith is not enough.  Id.

one of them (Hannon) in police uniform, told him that he had to provide the blood. Thus, his consent was secured as a result of misapprehension of the law.[10] Hannon testified at the hearing that he actually would not have conducted the blood draw if the defendant had refused, but he did not tell the defendant that, nor did Yazbek. Knowledge of the right to refuse consent is also an enumerated Vazquez factor. Moreover, the defendant's consent was obtained in a hospital trauma room where he was hooked up to an I-V apparatus and receiving treatment for injuries after a harrowing sea rescue, still another Vazquez factor.

I find as a "fact based on the totality of the circumstances" (Vazquez's terms) that the defendant's consent was effectively coerced and therefore not valid. Put another way, "[c]onsent pried loose by . . . a claim of authority is merely acquiescence," Vazquez, 724 F.3d at 23. The government must show "more than mere acquiescence in the face of an unfounded claim of present lawful authority." United States v. Brake, 666 F.3d 800, 806 (1st Cir. 2011).

### Probable Cause and Exigent Circumstances for Warrantless Blood Draw

Because the statute and regulations governing marine activity did not allow a blood draw without consent, because the consent that law enforcement obtained was invalid, and because law enforcement did not obtain a warrant, I next determine whether there were exigent circumstances justifying failure to seek a warrant and whether the officers had probable cause to conduct the blood

---

[10] I recognize that Yazbek and Hannon used the term "mandatory" and that Skinner used that word in describing tests that could not be compelled but whose refusal could produce negative employment consequences. Here, however, I am determining what the individuals using and hearing the word understood it to mean in the trauma room of Maine Medical Center on the evening of November 1, where the officer performing the blood draw was in police uniform.

draw.  Both are necessary.  <u>United States v. Almonte-Baez</u>, 857 F.3d 27, 31 (1st Cir. 2017).  It is the government's burden to prove both of these elements.  <u>Morse v. Cloutier</u>, 869 F.3d 16, 24 (1st Cir. 2017).  The "imminent destruction of evidence" is one of the exigent circumstance exceptions to the need for a warrant. <u>Id</u>.

### *Exigent Circumstances*

At 6 or 6:30 p.m., the Coast Guard Command Center first contacted Yazbek.  He proceeded to drive from his home in West Bath to Maine Medical Center in Portland.  While driving, he talked by cell phone to his supervisor, Lt. Ott.  She directed him to be sure to get both a breath test and a blood test.  Thus the decision to obtain the blood draw must have occurred soon after 6 or 6:30 p.m. because Yazbek thereafter made a number of phone calls to procure breath and blood testing and arrived at the hospital around 7:30 p.m.  The government produced no evidence that investigator Yazbek (or anyone on his behalf) made any effort to determine whether a federal or state judge was available to consider issuing a warrant.[11]  (That is unsurprising since Yazbek thought no warrant was necessary.)  At the hearing, the government introduced evidence about oxycodone's dissipation rate[12] and argued that in light of the defendant's estimate to rescue personnel that the boat capsized around 11 a.m., the need to preserve evidence justified the failure to get a warrant.  But there is no evidence

---

[11] As the Supreme Court noted in <u>Missouri v. McNeely</u>, sworn testimony communicated by telephone will allow federal magistrate judges to issue warrants.  569 U.S. at 154.  Maine allows warrants to be requested remotely via electronic means, so long as the request conforms to the ordinary written affidavit requirements.  Me. R. U. Crim. P. 41C(b).

[12] M. Cherrier et al., <u>Comparative Cognitive and Subjective Side Effects of Immediate Release Oxycodone in Healthy Middle Age and Older Adults</u>, J. Pain (Oct. 2009), <u>https://www.ncbi.nlm.nih.gov/pubmed/19729346. Gov't Ex. 13</u>.  <u>See also</u> Gov't Exs. 30-31.

that any of the decision-makers had any knowledge of that dissipation rate. Instead, investigator Yazbek testified that he believed he had 32 hours in which to obtain a blood test, which is the time the regulations allow in the event of a serious marine incident. 46 C.F.R. § 4.06-3(b)(1)(i). I conclude that the government has failed to show that the investigators faced exigent circumstances to justify their failure to seek a warrant. Post hoc reconstruction will not suffice. "[T]he bottom-line question is whether a reasonable officer would have thought, *given the facts known to him*, that the situation he encountered presented some meaningful exigency." <u>Morse</u>, 869 F.3d at 24 (emphasis added). The government has not met that standard. That alone makes the warrantless blood draw invalid. Nevertheless, I look at probable cause as well.

### *Probable Cause*

Lt. Ott, as Yazbek's superior, instructed him early in the evening of November 1 to obtain the blood draw. But I have no information about what she knew beyond the inference that she had the same information Yazbek had while he was driving to Portland, *i.e.*, a sinking in bad weather and the loss of two crew members. Since I have to approach the probable cause assessment here as a hypothetical construct and the decision to obtain the blood draw was not final until the draw occurred, I will look at everything Yazbek knew or was told up until the blood was drawn at 9 p.m.

Before Yazbek drew the defendant's blood (via Hannon), the Coast Guard had the additional information that none of the crew was wearing an immersion suit or a life jacket, that they were dressed in jeans and t-shirts, and that on account of the weather and heavy following seas the vessel "kind of" or "almost"

"started surfing down the front of a wave." The defendant gave his father that information, and his father relayed it to the Coast Guard from the hospital by phone. I assume that Yazbek learned it as well. Yazbek also knew that one crew member's father was adamant, Gov't Ex. 13, in wanting the defendant tested for drugs and alcohol. Contrary to the government's brief, Gov't Opp'n 1-2, and the initial testimony of USCG Criminal Investigator Volk, however, the Coast Guard and Yazbek were <u>not</u> told that a known drug dealer told the crew member's father that he had sold twenty 30-mg oxycodone pills to the defendant the day before.[13] Nor did they know of alleged marijuana use with a crew member's father or alcohol consumption at a party the day or night before. The Coast Guard and Yazbek also did <u>not</u> know of an alleged Facebook post that mentioned the defendant's drug use the night before the accident. The Coast Guard was aware that the *No Limits* had gone out in the face of gale forecasts and I will assume that information was available to Yazbek. The Coast Guard also had the defendant's statement to his rescuers in the helicopter that the boat "caught a wave, flipped." I attribute to the Coast Guard and Yazbek the knowledge that lobstering is a highly regulated and dangerous activity, as the defendant has stipulated.

I am not going to consider information that investigators developed *after* the blood draw—for example, the defendant's instruction in seamanship, his

---

[13] In his October 2, 2017, motion the defendant said that "A coast guard petty officer relayed the information about the alleged drug purchase to Yazbek," Def. Mem. 4 (ECF No. 77), but at the hearing his lawyer said that he wrote that based upon the government's assertion that it was so, and before the government produced discovery. The evidence at hearing did not support the assertion that such information was communicated to the Coast Guard before the blood draw.

prior criminal history,[14] the information in the toxicology report, other safety violations, the drug dealer's alleged statements to a crew member's father, or the Facebook post.

Aviation Survival Technician Evan Staph, a Coast Guard "swimmer," left the helicopter and rescued the defendant in 20-foot seas. The videos of the rescue reveal vividly the ready heroism of United States Coast Guard personnel. Gov't Ex. 9. Staph observed that when he made the defendant go back into the water from the life raft in order to be hoisted by the rescue basket, the defendant did not flinch at the cold water. But Staph did not make known this observation until after the blood draw. The government asks me to consider research it has found (specifically a 2009 research paper, Gov't Ex. 11) and a toxicologist's affidavit, Gov't Ex. 31, noting that opiates and oxycodone in particular have an analgesic effect that suppresses pain or cold and argues that the effect is common knowledge. But there is no evidence that anyone involved, including Staph, knew of that effect on November 1. More importantly, Staph said explicitly that he attributed the defendant's lack of reaction to cold water to hypothermia (not drugs), and the rescue personnel reported a "pretty bad" contusion on the defendant's left temple, Gov't Ex. 12. I therefore do not consider Staph's observation of the lack of reaction to cold water in the probable cause assessment.

---

[14] The criminal history reveals two OUIs and numerous other encounters with law enforcement. Gov't Ex. 2. The government argues that history was "constructively" available to the Coast Guard but there is no evidence that anyone knew or considered it.

The government also asks me to draw negative inferences from the video of the defendant being hoisted into the helicopter and his behavior in the helicopter (he appears to be moving well physically). There is no information that any of that behavior was made known to Yazbek or Ott or what inferences they would or should have drawn from it. Even if I add the defendant's helicopter behavior to the probable cause mix under United States v. Meade, 110 F.3d 190, 194 (1st Cir. 1997) (criticizing but not rejecting application of collective knowledge doctrine where information amounting to probable cause is dispersed throughout an agency and not known by any one individual), there is no evidence that it would have affected a probable cause assessment by a reasonable officer in the position of Yazbek or Ott if they had known it.[15]

Considering the information available as of 9 p.m. on November 1, a reasonable officer could certainly conclude that there was probable cause to conclude that Hutchinson behaved negligently or recklessly in going out November 1 and in how he allowed his crew to be dressed, and in his seamanship on the return. But it would be rank speculation to conclude that drugs were

---

[15] At the hearing, the government referred to the "collective" knowledge of the Coast Guard. The First Circuit certainly recognizes "collective police knowledge" in assessing probable cause, United States v. Pardue, 385 F.3d 101, 106 (1st Cir. 2004), but in the context of "working in collaboration" and one officer instructing another what to do, id. at 107; accord United States v. Barnes, 506 F.3d 58, 63 (1st Cir. 2007) ("[R]easonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion"). The Circuit has expressed skepticism over extending the collective knowledge doctrine to information known generally to an agency as contrasted with another individual officer's knowledge amounting to probable cause and upon which a different arresting officer took action. United States v. Meade, 110 F.3d 190, 193-94 (1st Cir. 1997). Since Meade, the Circuit has authorized a limited extension of the collective knowledge doctrine in circumstances not present here, see United States v. Cook, 277 F.3d 82, 86-87 (1st Cir. 2002) (collective knowledge of officers jointly participating in the challenged stop), but otherwise has refused to decide the question Meade left open. See United States v. Bashorun, 225 F.3d 9, 13-17 (1st Cir. 2000); Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009) ("[W]e need not enter this thicket.").

involved given the information available directly or indirectly to Yazbek. It is tantalizing to consider that the crew member's father who wanted drug and alcohol tests might have had other information that he could have made available to the Coast Guard but, without his doing so, that information cannot contribute to probable cause. And I repeat that this is all a hypothetical construct because Yazbek and his superior Ott never even considered whether there was probable cause or an exigency exception to the warrant requirement.

### *Leon* *Good Faith Exception*

The government argued in its brief that, if no justification exists for the blood draw, it should nevertheless not be suppressed because of the "good faith" exception derived from United States v. Leon, 468 U.S. 897 (1984). Gov't Opp'n 20-21. At oral argument the government conceded that the good faith exception does not apply to these facts.

That was a sensible concession. The good faith exception applies to warranted searches and seizures and a limited number of no-warrant scenarios. See LaFave, 1 Searches and Seizures § 1.3(g) (5th ed.). Those limited no-warrant scenarios include objectively reasonable reliance on binding appellate precedent, on a database erroneously informing police they have a warrant, and on a statute purporting to authorize the search but later determined to be unconstitutional. See Davis v. United States, 564 U.S. 229, 232, 238-39 (2011) (extending the exception to reliance on appellate precedent and noting previous extensions); id. at 258 (Breyer, J., dissenting) (enumerating scenarios in which the exception applies). None of those scenarios is present here. There is no general good faith

exception for all warrantless searches and seizures. See <u>United States v.</u> <u>Ramirez-Rivera</u>, 800 F.3d 1, 32 n.25 (1st Cir. 2015).

*Consequences*

Because there was no statutory or regulatory justification for a blood draw without consent, because there was no effective consent, because there was no warrant and no exigent circumstance to excuse seeking a warrant and no probable cause, the blood draw and its test results are inadmissible. The defendant concedes that this conclusion does not preclude use of what he may have said to other people.[16] He does seek to exclude any questions asked by law enforcement, government agents, and perhaps other parties concerning the testing process and results, or based on knowledge of the testing, and any statements he made in response to those questions as "fruit of the poisonous tree." <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963).

The government "has the ultimate burden of persuasion to show that its evidence is untainted," but the defendant "must go forward with specific evidence demonstrating taint." <u>Alderman v. United States</u>, 394 U.S. 165, 183 (1969); <u>see also</u> <u>United States v. Kornegay</u>, 410 F.3d 89, 93-94 (1st Cir. 2005) ("To succeed on a motion to suppress, a defendant must establish a nexus between the Fourth Amendment violation and the evidence that he seeks to suppress.") (citing

---

[16] At present, I am aware of statements the defendant made concerning the accident to i) Travis Sawyer, on November 2 and 3; ii) the *Bangor Daily News* on November 3; iii) Yazbek on November 3; iv) an insurance adjuster on November 3; v) a Maine Marine Patrol Officer on November 4; vi) the Coast Guard, in a handwritten report of marine casualty filed November 7; vii) a Department of Labor investigator, with counsel present, on November 17; viii) a lawyer for the insurer in a deposition, on December 11; and ix) the Coast Guard, in an interview on January 13, 2015. Gov't Opp'n 3-4. Not all of these statements refer to drug use.

Alderman, 394 U.S. at 183); United States v. Finucan, 702 F.2d 838, 844 (1st Cir. 1983); LaFave, 6 Search & Seizure § 11.2(b).

The defendant can demonstrate taint as to all questions asked based on knowledge of the testing and his responses to these questions. All such statements are inadmissible. He cannot establish taint as to voluntary statements not made in response to questions based on knowledge of the testing, as the defense essentially conceded at oral argument.[17] The parties assured me at oral argument that which questions are based on knowledge of the testing is clear from the record. That may be. It may also be that further specificity will be required before trial.

The government also asked me to rule that even if the test results are excluded from its direct case, they can be used as impeachment if the defendant chooses to testify at trial. The defendant's lawyer conceded that if the defendant opened the door by testifying at trial that, for example, he is not a drug user, the government could properly impeach this testimony with the results of the blood draw.

The First Circuit has held that "[w]hen a defendant opens the door to impeachment through his statements on direct, the government may try to establish that his testimony is not to be believed through cross-examination and the introduction of evidence, *including tainted evidence*, that contradicts the direct testimony." United States v. Morla-Trinidad, 100 F.3d 1, 5 (1st Cir. 1996) (emphasis added). The government can also use tainted evidence to impeach

---

[17] The defendant's concession was limited to "volunteered statements outside of the course of questioning *by law enforcement*."

testimony given for the first time on cross-examination, *if* the statements are "made in response to proper cross-examination reasonably suggested by the defendant's direct examination." Id. (quoting United States v. Havens, 446 U.S. 620, 627 (1980)). But the government may not "'smuggle in' the impeaching opportunity with a cross-examination that has 'too tenuous a connection with any subject opened upon direct examination.'" Id. (quoting Havens, 446 U.S. at 625).

I conclude that the government may use the tainted evidence to impeach any testimony offered by the defendant within the limits set by Morla-Trinidad, and in response to any defense tactics that otherwise open the door to it. See LaFave, 6 Search & Seizure § 11.6(b). It may not be used, as the government requested in its brief, to impeach the defendant's competence as a witness to perceive and remember events or to rebut the implicit assertion that his faculties were unimpaired.[18]

**CONCLUSION**

The motion to suppress is **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED.**

**DATED THIS 17TH DAY OF JANUARY, 2018**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[18] The government offered no legal support for this request. Gov't Opp'n 21 n.7.