## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 16-168-DBH** |
| | ) | |
| **CHRISTOPHER HUTCHINSON** | ) | |

## GOVERNMENT'S TRIAL BRIEF[1]

### I.   Status of Case

On December 14, 2016, a grand jury indicted Defendant Christopher Hutchinson for two counts of Seaman's Manslaughter in violation of 18 U.S.C. § 1115, for negligently causing the deaths of his two crewmen, 26-year old Tomas Hammond and 15-year old Tyler Sawyer on November 1, 2014.   On December 19, 2016, the Maine Marine Patrol arrested Hutchinson who made his initial appearance the same day.   The Court appointed attorney Jeffrey Langholtz to represent Hutchinson and the government filed a motion to detain Mr. Hutchinson pending trial. On December 20, 2016, Hutchinson retained attorney Phillip Cohen to replace attorney Langholtz.   On December 22, 2016, after a hearing, Hutchinson was released on conditions.

On February 14, 2017, the Court granted the government's request for a date certain for trial because of the number of witnesses that the government was going to have to bring to Maine for trial.   On March 6 and 7, 2017, attorney Michael Turndorf replaced attorney Phillip Cohen.   On April 3, 2017, the Court granted the government's motion to revoke Hutchinson's release on conditions pending trial because, among other things, he had overdosed on opiates.

---

[1] The government respectfully requests permission to exceed by three pages the local rule 20-page limit on trial briefs because this is a serious case with complicated factual and legal issues.

On April 24, 2017, the Court granted Hutchinson' motion to continue trial until the November trial list in order to give attorney Turndorf adequate time to prepare.   On May 30, 2017, the Court granted the government's motion and specially set the case for jury selection on November 1, 2017, with trial to follow immediately thereafter. The parties consented to jury selection by the magistrate.   Since then, the trial date has been continued at the defense' request four times.

On October 2, 2017, the defense filed a motion to suppress the blood sample drawn from the defendant in the hospital on November 1, 2014 on the grounds that it was taken in violation of the Fourth Amendment.   On December 18 and 19, 2017, the Court held a hearing and heard evidence and argument on the defense motion.   On January 17, 2018, the Court granted the defense motion, suppressed the blood draw and certain statements that the parties agreed were tainted fruit.   On February 15, 2018, the government filed a notice of appeal and sought approval from the Department of Justice to do so.   Ultimately, the Solicitor General declined to authorize appeal and the case was dismissed and remanded for trial.[2] The government notes that the parties have been negotiating and there is some possibility of the case being resolved with a plea of guilty.

The government provided the defense with initial Rule 16 discovery by letter dated December 28, 2016 and has been supplementing discovery continuously since then, including by

---

[2] The government sought permission to raise on appeal a legal argument it developed after the hearing.   That argument was that the regulations governing the Coast Guard's post-accident drug testing regime were contradictory in the respect that they mandated and required drug testing but prohibited coercion to obtain a sample for testing, vague in that they did not define what they meant by mandated, required and coercion, and incomplete in that they did not specify what administrative investigators could and could not do in order to obtain a sample. The investigators' actions were reasonable under the circumstances, consistent with the constitution, entitled to deference, and should have been upheld.   The Solicitor General declined to authorize appeal at least in part because the government failed to raise that argument below.

letters to attorney Cohen dated January 6, 2017 and February 3, 2017, and to attorney Turndorf dated March 30, 2017, April 4, 2017, May 11, 2017, May 30, 2017, June 5, 2017, August 28, 2017, September 11, 2017, and December 15, 2017.   On May 30, 2017, the government met in person with attorney Turndorf to review discovery and ensure that he had access to all of the discovery provided to that point.   Other than a request for early disclosure of all Jencks material, the government has honored all defense discovery requests to date, including a request for the grand jury testimony of one witness (which required a court order to produce).

To date, in response to its requests for reciprocal discovery, the government has received no discovery from the defense.

The United States currently plans to call approximately 35 witnesses and introduce approximately 50 exhibits, and expects that its case-in-chief will take no longer than one week to present.   The government will make arrangements to bring to Maine for trial at least 12 witnesses from out-of-state, many of them being Coast Guard members who have since transferred to other assignments.   For that reason, the government will again request a date certain for trial.   Once those witnesses have testified, the government would like to release those witnesses sooner than later.

## II.   Overview of the Offense

Fishing for lobster in the cold waters off the coast of Maine consistently ranks as one of the most dangerous occupations in terms of numbers of accidents, injuries and fatalities per full time equivalent.   Amongst the features that account for this dangerousness are the weather and sea conditions, the use of dangerous machinery, and lax attitudes towards safety.   The primary cause of death in the industry is drowning and most fatalities occur after a vessel disaster.

3

When there have been fatalities, the use of life saving equipment such as personal flotation devices (PFDs) and survival suits was low.   Survival rates double when flotation and cold water equipment is used.

Christopher Hutchinson was born in 1988, and was 26-years old in November of 2014. He started fishing for lobster when he was ten-years old.   He bought his first boat when he was fourteen, and bought bigger boats over time.   In 2009, he took a 100 Ton Captain's course which included lessons on boat handling and stability, weather, and lifesaving techniques. Hutchinson had a criminal history that included speeding, losing control of his vehicle on two separate occasions, and two convictions for operating a motor vehicle under the influence.

On July 21, 2014, Hutchinson bought a 45-foot, Young Brothers, fiberglass fishing vessel, which he renamed the "No Limits."   In the process of buying and selling the boat, the parties had it surveyed.   Among other things, the marine surveyor observed that the boat was equipped with survival suits, PFDs, a life ring, a life raft, and an Emergency Position Indicating Radio Beacon (EPIRB) with hydrostatic release mechanism.   In particular, the surveyor recommended that Hutchinson post a placard stating that no drugs were allowed on board.   In November of 2014, Hutchinson was tying up the No Limits at Linda Bean's wharf in Tenants Harbor.

The National Weather Service (NWS) issues weather forecasts and warnings to protect life and property.   Its products include "Outlooks" which provide approximately three-to-five days' advance notice of hazardous marine events while mariners are getting ready to go out, "Watches" which provide two-to-three days' notice while mariners are getting set to go out, and "Warnings" which provide a day's notice.   Marine warnings include "Small Craft Advisories"

which are issued for sustained winds or frequent gusts of 25 to 33 knots and/or hazardous seas with waves of 5 feet or higher.   "Gale Warnings" are issued for sustained winds or frequent gusts of 34 to 47 knots.   These products are disseminated by radio, over the Internet and by the NWS's media partners such as private radio stations, television stations, newspapers and online sites.   The NWS has approximately 34 radio transmitters in Maine, which cover the entire state, including Tenants Harbor and the zone where Hutchinson fished for lobster.

On Tuesday, October 28, 2014, the NWS began issuing a "Hazardous Weather Outlook" for the coming weekend.   An HWO is advance notice of an expected hazardous marine event having the potential to threaten life or property.   The HWO was for gale force, and even possibly storm force, winds.   On October 29, 2014, the NWS issued a coastal weather forecast that predicted a low pressure area moving northeast through the western Atlantic that might impact the Gulf of Maine that weekend.   On October 30, 2014, the NWS began issuing a detailed forecast for Saturday that predicted Northeast winds 20 to 25 knots with gusts up to 40 knots, seas 4 to 6 feet, building to 5 to 8 feet in the afternoon, with rain likely.   On Friday morning, October 31, 2014, the NWS issued a Gale Watch for Saturday morning through Monday morning.   On Friday afternoon, the NWS issued a Gale Warning.

On Friday, October 31, 2014, Christopher Hutchinson illegally purchased 20 30-milligram tablets of immediate action Oxycodone. That afternoon while preparing to go lobstering, Hutchinson smoked marijuana with Tyler Sawyer's father.   They discussed the predicted bad weather.   Hutchinson said he thought he had time to haul traps and get home, and he assured the father that he would take care of Tyler.   When Hutchinson went down to buy fuel and bait for the trip, the assistant wharf manager suggested that he not go out because of the

5

predicted bad weather.   That evening, with friends, Hutchinson went to a Halloween costume party at the Trackside Station restaurant/bar in Rockland, where he drank rum and coke.

Early Saturday morning November 1, 2014, Hutchinson picked up Tyler Sawyer and met Tomas Hammond at Linda Bean's wharf in Tenants Harbor.   At about 1 am, Security video shows them boarding the No Limits and leaving the wharf as rain begins to fall.   Hutchinson's plan reportedly was to haul lobster traps at Eleven Mile Ridge and get home before the weather got bad.   Eleven Mile Ridge is Southeast of Monhegan Island, Southwest of Matinicus Island, about 25 nautical miles Southeast of Port Clyde.

Christopher Hutchinson has made numerous statements about what happened on November 1, 2014.[3]   Hutchinson has consistently said that they steamed to Eleven Mile Ridge taking turns at the helm, on watch, and sleeping.   They arrived before sunrise which was approximately 7:13 am.   Once the sun rose, they started hauling traps.   They hauled for about three hours until the weather worsened and the wind shifted from out of the Northeast to out of the Southeast, at which point they agreed to head home, starting in around 10:30 am. Hutchinson was at the helm, "surfing" or riding the waves.   (These times are estimated based upon the time that the EPIRB alerted and upon what Hutchinson has said about how long it took for the EPIRB to pop up.)

---

[3]Amongst others, Hutchinson has made statements to: the Coast Guard swimmer who rescued him, to the helicopter crew, to the ambulance crew that transported him from Portland Jetport to Maine Medical Center, to Maine Medical Center staff, to his father in the hospital, to Tyler Sawyer's father on November 3rd, to a Coast Guard investigator on November 3rd, to insurance adjusters on November 3rd, to a Maine Marine Patrol Officer on November 4th, in a Report of Marine Casualty dated November 7th, and to acquaintances.   As part of its ruling on the motion to suppress, the Court suppressed statements made to law enforcement based upon the test results.

According to Hutchinson, the No Limits capsized stern over bow, while he was "surfing" the waves on his way in because the boat was pushed by a large wave, down the front of the large wave and into the back of the wave in front.   Hutchinson escaped from underneath the overturned boat, swam to it, climbed on to the back of it, and clung to the keel cooler for an hour or two until the boat rolled, and the EPIRB and life raft popped up.   Hutchinson swam to the life raft, climbed in, and cut the painter because he feared that the No Limits would sink and drag the life raft down with it.

At about 1:20 pm on November 1, 2014, the No Limits' Emergency Position Indicating Beacon alerted.   Its position was determined to be approximately 20 nautical miles Southeast of Port Clyde.   Conditions in the area were consistently measured as winds out of the Northeast at 20 to 30 knots and higher, seas from 4 to 12 feet and higher, air temperature of 43 degrees Fahrenheit, and sea temperature of 53 degrees Fahrenheit.

The Coast Guard contacted the Point of Contact registered to the EPIRB, Hutchinson's father, and verified that the No Limits was underway, that three were on board, their physical characteristics, and the safety equipment on board.   The Coast Guard used this information to project how objects such as the No Limits, its life raft, and crew would drift in the water given the weather and sea conditions, and to estimate how long the No Limits' crew could survive exposure to the elements.   Over that drift analysis, the Coast Guard superimposed different search patterns calculated to maximize the chances of finding the objects.

The Coast Guard repeatedly broadcast an appeal for assistance to all mariners in the area. The only response it received was from the uncle of Hutchinson's girlfriend at the time, who had been fishing in the lee (East) of Matinicus that morning, but who elected not to head out to assist.

The Coast Guard launched a 47-foot motor lifeboat from Rockland, and a helicopter from Cape Cod to search for the No Limits and its crew.   In addition, it began recalling the crew of the 327-foot cutter Campbell.   The Maine Marine Patrol boat the Guardian III, a 46-foot Wesmac, also headed out toward the last known position of the EPIRB in an effort to assist, but wound up turning back around Matinicus because the conditions were so adverse.   Neither the helicopter, nor the motor lifeboat, nor the Guardian III observed any other mariners at sea.

At approximately 4:08 pm, the Coast Guard helicopter located the No Limits' life raft. Hutchinson sent up a flare.   A Coast Guard swimmer descended and put Hutchinson in a basket and hoisted him into the helicopter.   Video of the helicopter cabin shows Hutchinson wearing wet shorts and t-shirt, conversing with the crew, taking off his clothes and zipping himself into a sleeping bag.   Amongst the things that Hutchinson told the crew were that he last saw Hammond and Sawyer on the back of the overturned hull and that they were not wearing either survival suits or PFDs.   The helicopter broke off its search in order to transport Hutchinson to Maine Medical Center (MMC) in Portland for treatment of his injuries.

At approximately 9:00 pm, at MMC in Portland, Coast Guard Administrative Investigator Richard Yazbek and Gorham Police Officer Hannon informed Hutchinson and his parents that they intended to sample Hutchinson's blood for testing.   Hutchinson's mother protested that Hutchinson was afraid of needles and asked if the draw could be delayed.[4]

By phone and in person on November 2nd and 3rd, Hutchinson admitted to Tyler Sawyer's father and mother that he was "dirty" at the time that the No Limits capsized.

---

[4] In light of the Court's suppression ruling, the government does not intend to go any further than this in its case-in-chief.

At 5:02 pm on November 1, 2014, the Coast Guard motor lifeboat located the bow of the No Limits protruding from the water.   The crew observed no signs of life.   Tomas Hammond and Tyler Sawyer have never been found.   The Coast Guard has issued letters of presumed death for both.

### III.   Statute and Elements

**A.     Seaman's Manslaughter**

18 U.S.C.A. § 1115 provides in pertinent part that:

> Every captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, and every owner, charterer, inspector, or other public officer, through whose fraud, neglect, connivance, misconduct, or violation of law the life of any person is destroyed, shall be fined under this title or imprisoned not more than ten years, or both.

> When the owner or charterer of any steamboat or vessel is a corporation, any executive officer of such corporation, for the time being actually charged with the control and management of the operation, equipment, or navigation of such steamboat or vessel, who has knowingly and willfully caused or allowed such fraud, neglect, connivance, misconduct, or violation of law, by which the life of any person is destroyed, shall be fined under this title or imprisoned not more than ten years, or both.

The essential elements of Seaman's Manslaughter are:

> First, that the defendant was the captain, owner or person employed on the fishing vessel No Limits;

> Second, that the defendant committed misconduct, negligence, inattention to duty or knowingly and willfully violated law; and

> Third, that by such misconduct, negligence, inattention to duty or violation of law, a human life was destroyed.

9

## IV.   Evidentiary Issues

**Demonstrative exhibits.**   The government plans to make use of charts illustrating

significant locations such as where the No Limits was lobstering and where it is estimated to

have capsized, where its EPIRB first alerted, where the life raft and bow were found, examples

of a PFD, survival suit, life raft, EPIRB, PowerPoint of the predicted and observed weather and

sea conditions, diagram of the Coast Guard Motor Lifeboat, a table tracking over time,

statements made by Christopher Hutchinson with respect to significant points of interest; charts

illustrating the reverse drift analysis that Arthur Allen performed to estimate where the No

Limits capsized..

Fed.R. Evid. 611(a) provides that

"[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:

    (1)  make those procedures effective for determining the truth;
    (2)  avoid wasting time; and
    (3)  protect witnesses from harassment or undue embarrassment."

It authorizes the admission of demonstrative exhibits such as charts that show the relationship

between items of evidence admitted during trial.   See United States v. Irvin, 2012 WL 974887

(10th Cir., March 22, 2012) (the evidence addressed in the exhibit should be admitted).   They tie

things together.   These "pedagogical devices" are not evidence themselves, but are aids to the

jury in its understanding of the evidence that has been admitted.   See United States v. Janati,

374 F.3d 263, 273 (4th Cir. 2004); United States v. White, 2013 WL 6512922 (7th Cir. Dec. 13,

2013).   They are not usually allowed to go to the jury room absent opposing party's consent.

See United States v. Milkiewicz, 470 F.3d 390, 397 n.14 (1st Cir. 2006).

**Authentication of the products of systems and processes.**   The government intends to introduce records of weather predictions made by the National Weather Service for the days leading up to November 1, 2014; records of weather and sea conditions observed by the two stations closest to the area where the No Limits capsized, one of which is owned and operated by NOAA, and the other by a consortium of private entities NORACOOS.

The weather data is not hearsay at all because it is not the statement of a person.   It is the product of automated detection, transmission and storage systems about which there is reason to believe that those systems were functioning as designed and producing accurate and reliable information at the time.   Pursuant to Federal Rules of Evidence 901(b)(9) and 902(13), the government has prepared certificates of authenticity to that effect.

The government also intends to introduce recordings of Coast Guard telephone and radio communications relating to the search and rescue.   These were automatically recorded by the Coast Guard's systems.   The government has prepared similar certificates of authentication for these recordings.

**Hearsay, confrontation rights and exceptions thereto, including those for public records and business records.**   The government intends to introduce Coast Guard records of the search and rescue effort including recordings of radio and telephone communications made in the course of the search and rescue effort; and Coast Guard letters of presumed death

The letters of death are admissible pursuant to Fed. R. Evid. 803(9)'s exception for public records of vital statistics because they are the official record of Tomas Hammond's and Tyler Sawyer's deaths which were reported to a public office in accordance with a legal duty.   42 U.S.C. Chapter 63 and 46 C.F.R. Part 4 provide the Coast Guard with the authority to investigate

marine casualties like the sinking of the No Limits.   42 U.S.C. § 6301(1) provides the Coast

Guard with authority to decide the cause of a marine casualty, "including the cause of any

death."

     The other Coast Guard records are admissible pursuant Fed.R. Evid. 803(6)'s exception

to the rule against hearsay for records of regularly conducted activities and/or pursuant to Fed.R.

Evid. 803(8)'s exception for public records.   With respect to many of these, the Government

anticipates using Certificates of Authenticity pursuant to Rule 902(11) to establish that the

documents in question are authentic records of regularly conducted business activities.   Even so,

the Government intends to have witnesses explain records that are not self-explanatory.

     Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in

the statement.   See Fed. R. Evid. 801(c).   A statement is an oral or written "assertion." Fed. R.

Evid. 801(a).   "Nothing is an assertion unless intended to be one."   Advisory Committee Notes

to Fed. R. Evid. 801.   Rule 803(6) creates an exception to the rule against hearsay for records of

regularly conducted activity.   It makes clear that such activities include "callings of every kind."

Fed. R. Evid. 803(6).   It defines such records as records in any form, of acts, events, conditions,

opinions, or diagnoses that were made at or near the time and based upon personal knowledge so

long as it was the regular practice of the activity to make and keep the record.   Fed. R. Evid.

803(6).   See United States v. Moore, 923 F.2d 910, 914 (1st Cir. 1991).

     Judges have broad discretion to admit records under Rule 803(6).   See United States v.

Evans, 572 F.2d 455, 490 (5th Cir.) cert. denied 439 U.S. 870 (1978); United States v. Jones, 554

F.2d 251, 252 (5th Cir. 1977); United States v. Carranco, 551 F.2d 1197, 1199-1200 (10th Cir.

1977).   A witness need not have any special qualifications in order to authenticate records.

Moore, 923 F.2d at 915.   A qualified witness need only be a person who can explain how a record was kept, not necessarily the person who actually prepared the record.   United States v. McGill, 953 F.2d 10, 14-15 (1st Cir. 1992) (assistant supervisor of bank's coupon collection center competent to lay foundation); United States v. Patterson, 644 F.2d 890, 900-01 (1st Cir. 1981).

If the records were prepared under circumstances which demonstrate their trustworthiness, then it is not necessary that the one who made or kept the record or who supervised its making and keeping, actually testify to establish the foundation for admission. See United States v. Flom, 558 F.2d 1179, 1182 (5th Cir. 1977); United States v. Pfeiffer, 539 F.2d 668, 670-71 (8th Cir. 1976); Carranco, 551 F.2d at 1199.   The requisite knowledge may be inferred from the fact that it was someone's business to obtain the information.   United States v. Lieberman, 637 F.2d 95, 100 (2d Cir. 1980).

Documents can be distinctive enough, by appearance or content, to be self-authenticating. Fed. R. Evid. 901(b)(4). A finding of authentication may be based entirely on circumstantial evidence, including the writing's contents and substance.   See United States v. Bagaric, 706 F.2d 42, 67 (2d Cir.1983).   Writings may correspond to a series of events, and be so interrelated with these events that the combination demonstrates authenticity.   See United States v. Whitworth, 856 F.2d 1268, 1282-83 (9th Cir. 1988); United States v. Hoag, 823 F.2d 1123, 1126-27 (7th Cir. 1987)(letters fit into course of correspondence, progressive course of action); Rice v. United States, 251 F. 778, 783 (1st Cir. 1918)(progressive letters in scheme to defraud).

Besides the evidentiary rule against hearsay, the Confrontation Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to be confronted with

witnesses against him." <u>U.S. Const. Amend. VI</u>.   In <u>Crawford v. Washington</u>, 541 U.S. 36

(2004), the Supreme Court held that a testimonial, out-of-court statement is not admissible unless

the declarant testifies, the defendant had a prior opportunity for cross-examination and the

declarant is unavailable, or the statement is admitted for purposes other than establishing the

truth of the matter asserted.   <u>United States v. Maher</u>, 454 F.3d 13, 19-20 (1st Cir. 2006)

(citations omitted).

   In <u>Crawford</u>, 541 U.S. at 68, the Court did not fully define the term "testimonial," but

stated, that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a

preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."   It

did, however, give two examples of "statements that by their nature were not testimonial" --

business and public records.   <u>Id.</u> at 56; <u>see id.</u> at 76 (Rehnquist, C.J., concurring).

   Under <u>Crawford</u>, there are two threshold issues: (1) whether the out-of-court statement in

dispute is hearsay, and (2) whether the out-of-court statement in dispute is testimonial.   <u>United</u>

<u>States v. Earle</u>, 488 F.3d 537, 542 (1st Cir. 2007).   The Confrontation Clause only "applies to

witnesses against the accused – in other words, those who bear testimony."   <u>Davis v.</u>

<u>Washington</u>, 547 U.S. 813, 823-24 (2006) (quoting <u>Crawford</u>, 541 U.S. at 51).   "Not all hearsay

implicates the 6th Amendment's core concerns."   <u>Crawford</u>, 541 U.S. at 51. Rather, the

proffered evidence must be testimonial in nature.   <u>See</u> <u>e.g.</u> <u>Davis</u>, 547 U.S. at 823-24 (looking to

the primary purpose of police questioning and responses to determine whether responses were

testimonial).

   The records described above do not contain statements that are testimonial in character

such that the confrontation clause requires a defendant be able to cross examine the person who

created the statements in the records.    Business records are non-testimonial.    See Crawford,

541 U.S. at 56 (2004) (cited in United States v. Hagege, 437 F. 3d 943, 958 (9th Cir. 2006));

United States v. Munoz-Franco, 487 F.3d 25, 38 (1st Cir. 2007).   Documents "created for the

administration of an entity's affairs and not for the purpose of establishing or proving some fact

at trial ... are not testimonial."   Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009).

Likewise, documents "not made in anticipation of litigation[.] ... [but] simply a routine, objective

cataloging of an unambiguous factual matter" are not testimonial.   United States v. Bahena-

Cardenas, 411 F.3d 1067, 1075 (9th Cir. 2005).

**Opposing party statements.**   The government plans to introduce statements by Mr.

Hutchinson about the circumstances under which the No Limits sank.   These are admissible as

non-hearsay statements of a party-opponent pursuant to Fed.R. Evid. 8012(d)(2).

**Statement of personal history.**   The government plans to elicit from Tyler Sawyer's

father, and Tomas Hammond's father information about their sons such as how they came to

work for Christopher Hutchinson.   Such statements are admissible pursuant to Rule 804(4)(B)'s

exception for statements of personal history because Hammond and Sawyer are unavailable to

explain themselves.   The fathers' association with their sons is such that their information is

likely to be accurate.

**Summary tables and charts.**   Meteorologist Hendricus Lulofs has prepared a

PowerPoint presentation that summarizes the weather predictions made in the days leading up to,

and the weather and sea conditions observed on, November 1, 2014.

Fed.R. Evid. 1006 provides that a proponent "may use a summary, chart, or calculation to

prove the content of voluminous writings, recordings, or photographs that cannot be

conveniently examined in court."   See United States v. Aubrey, 2015 WL 5201800 (9th Cir.

Sept. 8, 2015); United States v. Fahnbulleh, 2014 WL 2619820 (D.C. Cir. June 3, 2014); United

States v. Rizk, 660 F.3d 1125, 1131 (9th Cir. 2011).   The evidence from which the table was

prepared is admissible as the non-hearsay statement of a party opponent pursuant to Fed.R. Evid.

801(d)(2).   See United States v. Oros, 578 F.3d 703 (7th Cir. 2009); United States v. Jamieson,

427 F.3d 394 (6th Cir. 2005).   The table is substantive evidence whose admissibility does not

depend on the admission of the underlying records.

     A witness testifying about such an exhibit does not have to have personally created either

the underlying records or the table, so long as the underlying records are competent and the

witness is familiar with the exhibit and can attest to its accuracy.   See Fahnbulleh.

     **Expert witnesses.** Federal Rule of Evidence 702 provides that an "expert qualified by

knowledge, skill, experience, training, or education may testify in the form of an opinion or

otherwise if" their "knowledge will help the trier of fact to understand the evidence or to

determine a fact in issue; … the testimony is based on sufficient facts or data; … the testimony is

the product of reliable principles and methods; … reliably applied … to the facts of the case."

The trial judge should act as gatekeeper to ensure that expert testimony is reliable.   See

generally Advisory Committee Notes to 2000 Amendment to Rule 702.

     Considerations include whether the expert's field has standards and controls and is

considered reliable, whether the expert's theory can be tested or objectively challenged, whether

it has been subject to peer review and publication and is generally accepted in the relevant

community, whether their theory has been reliably applied, whether there is too great an analytic

gap between premise and conclusion, and whether they have accounted for obvious alternative

explanations. Id. Even so, scientific rigor is not required, experts may be qualified on the basis of experience alone, a judge as gatekeeper is not intended to replace the adversarial system, and rejection of expert testimony is the exception rather than the rule. See id.

The government plans to call witnesses on the dangerousness of lobstering, drift analysis, functional survivability, the toxicology and neurocognitive effects of oxycodone, marine safety, and navigation in heavy seas.   Some of these were specially retained to offer opinions at trial. Others were participants in the historical events of the case.

More specifically, the government plans to call Hendricus Lulofts to describe the weather predictions and observations made regarding November 1, 2014, Tim Carton to describe the drift analysis and Arthur Allen to describe the functional survivability calculations that the Coast Guard used as considerations in conducting its search and rescue operation. The government believes that this testimony is not expert opinion testimony but rather is testimony about matters of historical fact in the case because experts are persons retained to apply their "principles and methods to the facts of the case."   See F.R. Evid. 702(d).   Even so, the government has provided the defense with discovery of Lulofts', Carton's, Allen's, and Adams' backgrounds and qualifications, reports and summaries of their analyses.   See F.R. Crim. P. 16(a)(1)(G).

The government also plans to call Professor Mary Davis to describe the dangers of lobstering, Tim Carton to explain how he applied reverse drift analysis to project where the No Limits capsized, Arthur Allen to opine that the functionality that Hutchinson exhibited in the helicopter cabin was inconsistent with the exposure he claims to have experienced, to explain how Hammond and Sawyer likely died, and to explain that Hammond and Sawyer would have survived longer if they had been wearing survival suits and/or PFDs; Edward Bilsky to describe

17

the neurocognitive effects of Oxycodone; and William Armstrong to describe proper seamanship in adverse conditions. The government believes that these matters are opinions of experts specially retained for trial, and it has complied with Rule 16(a)(1)(G)'s special discovery rules applicable to such witnesses.

More specifically, the government plans to elicit from Coast Guard Chief Petty Officer and former Surfman Instructor William Armstrong an explanation of how a boat is most stable, responsive and secure in adverse conditions when it turns and faces oncoming waves, keeps its propeller in the water to maintain power and control, and uses its bow as designed to pierce waves.   Chief Armstrong is an expert by virtue of his extensive experience operating boats in heavy weather and teaching others how to operate boats in heavy weather.   The government plans to elicit from toxicologist, pharmacologist and neurobiologist Dr. Edward Bilsky a description of how alcohol, marijuana, and Oxycodone, individually and in combination, affect sensory function, motor control, concentration, and performance, as well as his opinions how the marijuana, alcohol and Oxycodone that Christopher Hutchinson ingested on October 31st and November 1st contributed to his capsizing the No Limits on November 1st.

Federal Rule of Evidence 704 provides that an expert may offer an opinion that embraces an ultimate issue, except that an expert may not offer an opinion about whether a criminal defendant possessed a mental that constitutes an element of the crime charged.   Chief Armstrong and Dr. Bilsky's testimonies are not opinions that Mr. Hutchinson was negligent. They are explanations of matters likely beyond the average layperson's experience from which a juror may infer Hutchinson was negligent.   Contrast United States v. Wood, 207 F.3d 1222, 1235-36 (10th Cir. 2000) (Pathologist's testimony that manner of patient's death was homicide

18

caused by unwarranted, unreasonable, reckless medical treatment violated Rule 704(b). It did not merely provide the facts or opinions from which the jury could infer that the defendant had the requisite mental state for involuntary manslaughter.   It intruded into the province of the jury by dictating the mens rea for involuntary manslaughter.)

**Uncharged misconduct.**   Hutchinson's purchase of Oxycodone and smoking of marijuana the day before the sinking, and his employment of an underage person in a dangerous occupation (as well as his violation of numerous statutes and regulations such as those prohibiting operating a vessel under the influence) are items of uncharged misconduct that are direct, intrinsic evidence of the Seaman's Manslaughter with which he is charged.   Hutchinson's history of operating a vehicle under the influence in 2013 and 2008, of losing control of his vehicle twice in 2013, and his general history of drug use is extrinsic, other bad acts evidence.[5]

Rule 404(b) of the Federal Rules of Evidence governs the admission of evidence of other crimes, wrongs, or acts.   It prohibits the admission of such evidence to prove that the defendant has a bad character or the propensity to commit crimes of the sort for which he is on trial:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.   It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b).

The initial inquiry should be whether the proffered evidence is evidence of other bad acts

---

[5] Additionally, the government alerts the court, as it has already alerted defense counsel, that some witnesses have expressed the suspicion that Hutchinson went out on November 1, 2014 to "ghost fish" by pulling other lobstermen's traps knowing that they would stay in because of the predicted bad weather.

19

or is direct evidence of the charged crimes.   The categories are not mutually exclusive.   <u>United States v. Randazzo</u>, 80 F.3d 623, 630 (1st Cir. 1996).   The same evidence may be proof of charged and uncharged crimes.   <u>Id.</u>   The distinction may be one of policy and degree.   <u>Id.</u>   It may be made in terms of proximity in time and of place or entanglement of events and crimes.   <u>See id.</u>   Alternatively, the distinction may be a function of the relative strength of the permitted (special relevance) and forbidden (propensity) inferences.   <u>See id;</u> <u>United States v. Varoudakis</u>, 233 F.3d 113, 119 (1st Cir. 2000) (other crimes evidence is a function of two factors: the resemblance of the two crimes and their remoteness in time).

Rule 404(b) generally bars the use of other crimes to prove mere propensity to behave in a certain way but permits the use of such evidence where it has "special relevance" to prove material facts such as knowledge, intent or motive.   <u>United States v. Mensah</u>, No. 12-1066 at 49 (1st Cir. December 16, 2013) (quoting <u>United States v. Walker</u>, 665 F.3d 212, 229 (1st Cir. 2011)).   The "special relevance" standard is not "particularly demanding."   <u>United States v. Jimenez</u>, 507 F.3d 13, 17 (1st Cir. 2007), quoted in <u>United States v. Wyatt</u>, 561 F.3d 49, 52 (1st Cir. 2009).   It is more inclusive than exclusive. <u>United States v. Donovan</u>, 984 F.2d 507, 512 (1st Cir. 1993), quoting <u>United States v. Fields</u>, 871 F.2d 188 (1st Cir.), cert. denied, 493 U.S. 955 (1989).   The Supreme Court has held that prior bad acts may be introduced for a relevant purpose besides proving propensity to commit crimes if they establish the truth regarding a disputed issue.   <u>See</u> <u>Huddleston v. United States</u>, 485 U.S. 681, 685 (1988) (quoted in <u>Pagan v. Dickhaut</u>, 578 F.Supp.2d 343, 350 (D. Mass. 2008)).

Even so, pursuant to Rule 403, a court must ensure that the probative value of the other crimes evidence is not substantially outweighed by its prejudicial effect.   <u>Romero-Lopez</u>, 695

20

F.3d at 23.   Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   The rule does not exclude prejudicial evidence.   All evidence is meant to be prejudicial in the sense that it has a tendency to make more likely some proposition unfavorable to the adversary.   The rule excludes evidence that is unfairly prejudicial.   See United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2002).   Unfair prejudice includes evidence that is unreliable.   It includes evidence that invites the jury to decide an issue on other than an individual, rational, evidentiary basis such as emotion, propensity, or unthinking acceptance of purported expertise. See Varoudakis, 233 F.3d at 122; Mensha at 49.

Here, Hutchinson's use of marijuana on the 31st and Oxycodone on 1st are not uncharged, other misconduct evidence.   They occurred contemporaneously with the capsizing.   THC and Oxcodone were found in Hutchinson's blood immediately after the capsizing.   They are charged in the indictment.   They are intrinsic evidence of the Seamans Manslaughter charged, and they are not unduly prejudicial.   They do not present an undue risk of the jury deciding the case on some improper emotional basis.   They will not confuse or mislead the jury.   They are intrinsic evidence of one aspect of Hutchinson's negligence: his operation of the No Limits under the influence of intoxicants.   They are not needlessly cumulative.   They are probative of disputed matters of fact that cannot be proved otherwise (there is no eyewitness to say that Hutchinson appeared under the influence at the time of the capsizing for example). They do not pose the risk that the jury will use propensity logic and convict Hutchinson of involuntary manslaughter because of some similar bad act he committed long ago, or because of his general bad character.

People are not inclined to think of drug users as killers.   On the other hand, evidence that Hutchinson bought Oxycodone on the 31st and smoked marijuana on the 1st gives the government a fair opportunity to hold him responsible for what he did that caused the deaths of Tomas Hammond and Tyler Sawyer.

Hutchinson's history of drug use, his history of operating a motor vehicle under the influence, and his history of losing control of a motor vehicle are extrinsic other crimes and bad acts evidence subject to Rule 404(b)'s prohibition.   However, they fall within the exception for other bad acts evidence that is specially relevant to one of the central disputed issue for trial, Hutchinson's mental state and whether he was negligent and failed to exercise due care.   Short of an admission, there is no way to directly prove that mental state.   It must be proved indirectly and circumstantially.

In this regard, evidence that Hutchinson was familiar with the effects of intoxicants on his ability to operate vehicles in general, and his familiarity with the effects of opiates in particular, is specially relevant to whether he failed to exercise due care at the time that the No Limits capsized.   They not likely to confuse or mislead the jury or cause the jury to engage in propensity logic because drug use and OUI are separate and distinct offenses from Seamans Manslaughter.   People are unlikely to think of drug users (as opposed to dealers) as killers.

While the connection between Operating Under the Influence and Seamans Manslaughter may be closer, still that connection is relatively remote.   According to the CDC, in 2014 (the most recent year for which data was available), people self-reported 111,000,000 instances of alcohol-impaired driving.   In 2015, nearly 1.1 million drivers were arrested for driving under the influence, and 10,265 people died in alcohol-impaired driving crashes.   That's about 1% of the

number of arrests and about .01% of the number of self-reported incidents in 2014.   Data available online at www.cdc.gov/motorvehiclesafety/impaired_driving/impaired -drv_factsheet.

**Witnesses with criminal exposure and immunized witnesses.**   The government plans to call as witnesses the two drug dealers who cold Hutchinson Oxycodone on October 31, 2014. One is represented by Rick Bene, has been given informal letter immunity, and has testified to the grand jury.   The other was advised of his rights, declined the offer of a referral letter, is not represented, waived his right against self-incrimination and testified to the grand jury.   The government is prepared to immunize him should that become necessary.

**Proof of proximate cause and foreseeability.**   Defendant's experience with operating vehicles under the influence of intoxicants, and his experience with Oxycodone in particular is charged in the indictment and relevant to his ability to foresee that operating his boat under the influence might result in its and its crew's demise.

**Judicial notice.**   Federal Rule of Evidence 201 provides in pertinent part that, "at any stage of the proceeding," a "court may judicially notice a fact that is not subject to reasonable dispute because it … is generally known within the trial court's territorial jurisdiction; or … can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned[;]" and provides that a court "must take judicial notice if a party requests it and the court is supplied with the necessary information."   In this regard, the United States Naval Observatory has determined and certified that the sun rose over the area of Eleven Mile ridge about 7:11 am on November 1, 2014.

Respectfully submitted,
/s/ Halsey B. Frank
Halsey B. Frank
United States Attorney

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 26, 2018, I electronically filed Government's Trial Brief with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to counsel of record:

Michael Turndorf, Esq.
TurndorfLaw, P.A.
415 Congress Street
Suite 201
Portland, Maine   04101

/s/ Halsey B. Frank
United States Attorney
United States Attorney's Office
100 Middle Street, East Tower, 6th Floor
Portland, Maine 04101
(207) 780-3257
Halsey.Frank@usdoj.gov